**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

JONATHAN SADIK, }
        *Plaintiff(s)* }
    }
v. } CIVIL ACTION NO. H-03-4296
    }
UNIVERSITY OF HOUSTON, *et al.*, }
        *Defendant(s)* }

**MEMORANDUM OPINION AND ORDER
GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Pending before the Court is Defendants' motion for summary judgment (Doc. 12). For the reasons set forth below, the Court **ORDERS** that the motion is **GRANTED**. Final judgment is entered in favor of Defendants.

**I.    BACKGROUND AND RELEVANT FACTS**

This is a disability discrimination action brought by Plaintiff Jonathan Sadik ("Sadik") against Defendants University of Houston (the "University") and Professors Leonard Trombetta ("Trombetta"), Frank Claydon ("Claydon"), Stuart Long ("Long"), and John Glover ("Glover"). Plaintiff's claims arise from an incident that led to charges of academic dishonesty against him and from alleged subsequent discriminatory treatment of him by Professors Trombetta, Claydon, Long and Glover. Specifically, Plaintiff asserts claims against the University for alleged violations of (1) Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 *et seq.*, and (2) Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 *et seq.* Plaintiff further asserts claims against the individual defendants under 42 U.S.C. § 1983 and against all defendants for violations of various Texas state laws. The factual bases underlying these claims are as follows.[1]

At all relevant times Plaintiff was a student at the University and was acknowledged to be an individual with a physical disability, which required his use of a wheelchair. Because of his disability, Plaintiff registered with the University's on-campus Center for Students with Disabilities

---

[1] The facts recounted herein are established by uncontroverted evidence, are not in dispute, or are based on allegations construed in the light most favorable to Plaintiff.

(the "Center") and received authorization for extended time in which to take examinations and other accommodations. Plaintiff does not allege that he was ever denied any relevant accommodation by any of the Defendants.

In spring 2002 Plaintiff, an Electrical and Computer Engineering (ECE) major, was enrolled in ECE 3455, an engineering course in electronics. There were two sections in ECE 3455, and Plaintiff was in the section taught by Professor Trombetta. Two exams and a final were given in the course. The exams were departmental exams, meaning that both sections of the course were given the same exam. The exams were given on a Saturday so that all students could take the exam at the same time. Plaintiff, however, had the option of taking his exam at the Center for Students with Disabilities. Because the Center was not open on Saturday Trombetta allowed Plaintiff to take the exam either on the Friday before the exam was to be administered or on the following Monday. Plaintiff took the exam on the Friday before.[2]

Shortly after the exam began, Plaintiff left the cubicle where he was taking the exam and went to the men's room. Michael Henry ("Henry"), who has worked at the Center for ten years, noticed that Plaintiff left not long after the start of the exam. Henry considered a student's going to the restroom facilities this early in an exam to be unusual, so he went to the front desk of the Center to see whether Plaintiff had left his exam there, as he was supposed to do. Plaintiff had not left the exam at the front desk. Henry then checked to see if Plaintiff had left the exam in the exam room. The exam was not there, either.[3]

Henry then went to the men's room. When he walked in the door he saw that both stalls were occupied. Henry also saw what appeared to be a camera flash. Henry told Plaintiff, who was in one of the stalls, to give him the exam. Plaintiff handed the exam to Henry from under the stall. Henry did not search for or obtain a camera from either student while in the men's room. Henry took the exam back to the front desk. Plaintiff left the men's room, retrieved his exam from the front

---

[2]Trombetta Affidavit, Doc. 13 Ex. A.

[3]Henry Affidavit, Doc. 13 Ex. B.

desk, returned to the exam area, and completed his exam. Henry meanwhile had retrieved a camera of his own from his cubicle and waited outside of the men's room for the other student to exit. When he did, Henry took pictures of the other student.[4] Plaintiff does not dispute that he left the testing area and took his exam with him into the men's room, that another student was in the men's room at the same time, that Henry entered the men's room and asked for the exam, and that he handed the exam to Henry under the stall.

On the following Monday Henry reported the incident to the Center's Director, Cheryl Amoruso ("Amoruso"), who had been out of the office the previous Friday. Plaintiff and the student who was in the men's room with Plaintiff had been taped by the security cameras in the Center's hallways while going down the hall to/from the men's room. Amoruso called Trombetta to report the incident.[5] Trombetta viewed the videotape. A comparison of the videotape and the pictures taken by Henry showed that the student who went into the men's room just before Plaintiff did was student M.B.,[6] who was enrolled in the same course, but in a different section from Plaintiff. M.B. was scheduled to take the exam the next day. M.B. is not disabled.[7]

Based on this evidence, Trombetta brought charges of academic dishonesty against Plaintiff and M.B. Pursuant to the University's policies, Plaintiff was entitled to and was first given an informal hearing in front of the department chair, Professor Claydon. At this hearing Trombetta explained the evidence he had of academic dishonesty, and Plaintiff was given the opportunity to respond to those charges. Claydon showed Plaintiff the student handbook and asked him if he was aware of the University's procedures. Claydon also went over the charges against him, and asked if he had anything to say. Further, Claydon asked Plaintiff if the charges were true, to which

---

[4]*Id.*

[5]*See* Amoruso Affidavit, Doc. 13 Ex. D.

[6]In the interest of this student's privacy, this student will be referred to only as "M.B."

[7]Trombetta Affidavit, Doc. 13 Ex. A.

3

Plaintiff said no.[8] Plaintiff told Claydon that the allegation was groundless and he gave a brief overview of reasons why it would not have happened. Claydon found that Plaintiff was guilty of academic dishonesty and recommended suspension for one year. Claydon apprised Plaintiff of his right to appeal his finding. Claydon made the same finding and recommendation for M.B., who, as noted above, is not disabled.[9]

Both students appealed the findings and recommendations to a University hearing panel. That panel was made up of three students and two faculty members. Associate Dean Larry Witte was the Hearing Officer. Plaintiff was allowed to have an attorney present to advise him, which he did, but the attorney was not allowed to speak to the committee. At that hearing, Plaintiff had the right to call witnesses, to confront the witnesses against him, and was given the opportunity to tell his side of the story. The hearing was bifurcated into separate inquiries as to guilt and punishment. The committee found both Plaintiff and M.B. guilty of academic dishonesty and recommended a one-year suspension for each student.[10]

After the committee hearing, Plaintiff was entitled by University rules to a review by the Provost. He exercised that right. The Provost reviewed the evidence and at first upheld the findings of the department chair and the academic dishonesty committee.[11] Subsequently, after Plaintiff had retained counsel, the Provost reversed himself and overturned the findings of guilty. He directed that Plaintiff be given the grade he would have received had the academic dishonesty charges not been made.[12] Trombetta gave Plaintiff a grade of D+ in the course.

The ECE Department requires that students make a C- or better in courses required for their major. Because ECE 3455 is a required course for Plaintiff's major, he was required to take it again

---

[8] *See* Claydon Affidavit, Doc. 13 Ex. E.

[9] *Id.*

[10] *See* Letter from Dean Larry Witte to Sadik, dated 20 May 2002, Doc. 13 Ex. H.

[11] *See* Letter from Provost Edward Sheridan to Sadik, dated 15 July 2002, Doc. 13 Ex. I.

[12] *See* Letter from Provost Edward Sheridan to Sadik, dated 21 August 2002, Doc. 13 Ex. I.

4

the next fall. ECE 3455 is also a prerequisite for two other courses in which Plaintiff was enrolled for the fall semester. Plaintiff was at first told that he must drop the two courses for which ECE 3455 was a prerequisite. Plaintiff's attorney, however, filed a Request for a Temporary Restraining Order in this Court, and as the result of a mediation between the parties Plaintiff was allowed to re-take ECE 3455 under a different professor and he was allowed to remain in the other two courses.[13] However, the D+ in the ECE 3455 course under Trombetta remained unchanged.

During the fall semester, Plaintiff no longer used a wheelchair, but he was still provided with extra time on his exams and quizzes. Two of his engineering professors that semester were Defendants Glover and Long. Plaintiff alleges that Dr. Glover discriminated against him by engaging in the following behavior: (1) along with another professor, he implemented a policy of having students write on their exams that they had neither given nor received aid in taking the exam;[14] (2) he intentionally lost Plaintiff's form listing the accommodations he was entitled to receive, and Plaintiff had to call the Center, get another form, and call to make sure the form was received in time for him to continue taking tests at the Center;[15] (3) he asked the class who would be taking his course the next semester and, after Plaintiff and M.B. raised their hands, commented, "Well, I know who to pass and fail this semester";[16] and (4) finally, Plaintiff alleges that Glover discriminated against him when, while escorting Plaintiff to a room where he was to finish an exam for which he was being allotted extra time, Glover told several students who were in the hall not to talk because there was a student still taking the exam.[17]

As for Defendant Long, another one of Plaintiff's professors in 2002, Plaintiff alleges that Dr. Long engaged in two discriminatory acts against him. First, Plaintiff claims that Dr. Long's having a teaching assistant follow him from an exam room to a separate room where he was going

---

[13]*See* Claydon Affidavit, Doc. 13 Ex. E.

[14]Sadik Deposition, Doc. 13 Ex. K at p. 54.

[15]Sadik Deposition, Doc. 13 Ex. O at p. 65.

[16]Sadik Deposition, Doc. 13 Ex. ¶ at ¶¶. 66-67.

[17]*Id.* at 67, 71.

5

to finish his test was an act of discrimination. Second, Plaintiff alleges that a student in Long's class refused to tutor a group of students if Plaintiff was included.[18] Plaintiff admits, however, that he has no knowledge of whether Long ever spoke to this tutor about him.[19]

Plaintiff filed suit against Defendants in state court in August 2003, asserting (1) claims against the University for alleged violations of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131 *et seq.*, and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 *et seq.*;  (2) claims against the individual defendants under 42 U.S.C. § 1983; and (3) claims against all defendants for violations of various Texas state laws. Defendants timely removed to this Court, asserting federal question jurisdiction. Defendants have moved for summary judgment, asserting that the University is entitled to Eleventh Amendment immunity with respect to the ADA claim and that the rest of Plaintiff's claims fail because he has failed to marshal any evidence of discrimination on the basis of his disability. Plaintiff has responded, and the motion is ripe for ruling.

## II.     SUMMARY JUDGMENT STANDARD

The movant seeking a federal summary judgment initially must inform the court of the basis for his motion and point out those portions of the pleadings, depositions, answers to interrogatories, and admissions on file that demonstrate the absence of a genuine issue of material fact and show that he is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant need not negate the opposing party's claims nor produce evidence showing an absence of a genuine factual issue, but may rely on the absence of evidence to support essential elements of opposing party's claims. *International Assoc. of Machinists & Aerospace Workers, Lodge No. 2504 v. Intercontinental Mfg. Co.*, 812 F.2d 219, 222 (5th Cir. 1987). The burden then shifts to the non-movant to set forth specific facts and competent summary judgment evidence to raise a genuine issue of material fact on each essential element of any claim

---

[18] Sadik Deposition, Doc. 13 Ex. Q at p. 76.

[19] Sadik Deposition, Doc. 13 Ex. R at p. 81.

on which he bears the burden of proof at trial. Fed. R. Civ. P. 56(c). The substantive law governing the suit identifies the essential elements of the claims at issue and therefore indicates which facts are material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The non-moving party may not rest on mere allegations or denials in its pleadings, but must produce affirmative evidence and specific facts. *Anderson*, 477 U.S. at 256-57. He meets this burden only if he shows that "a reasonable jury could return a verdict for the non-moving party." *Id.* at 254. A mere scintilla of evidence will not preclude granting of a motion for summary judgment. *Id.* at 252.

All reasonable inferences must be drawn in favor of the non-moving party. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574. 587-88 (1986), citing *United States v. Diebold*, 369 U.S. 654, 655 (1962). Once the burden of proof has shifted to the non-movant, he "must do more that simply show that there is some metaphysical doubt as to the material facts." *Id.* at 586. Instead he must produce evidence upon which a jury could reasonably base a verdict in his favor. *Anderson*, 477 U.S. at 249. "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.*, 477 U.S. at 249-50. Moreover the non-movant must "go beyond the pleadings and by her own affidavits or by depositions, answers to interrogatories and admissions on file, designate specific facts that show there is a genuine issue for trial." *Webb v. Cardiothoracic Surgery Assoc. of North Texas, P.A.*, 139 F.3d 532, 536 (5th Cir. 1998). Unsubstantiated and subjective beliefs and conclusory allegations and opinions are not competent summary judgment evidence. *Grimes v. Texas Dept. of Mental Health and Mental Retardation*, 102 F.3d 137, 139-40 (5th Cir. 1996); *Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir.), *cert. denied*, 513 U.S. 871 (1994); *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir.), *cert. denied*, 506 U.S. 825 (1992). Nor are pleadings summary judgment evidence. *Wallace v. Texas Tech University*, 80 F.3d 1042, 1046 (5th Cir. 1996), *citing Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)(*en banc*). The non-movant cannot discharge his burden by offering vague allegations and legal conclusions. *Salis v. Carpenter*, 908 F.2d 299, 305 (5th Cir. 1992); *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 889 (1990). Nor is the district court required

by Rule 56 to sift through the record in search of evidence to support a party's opposition to summary judgment. *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998), *citing Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915-16 & n.7 (5th Cir.), *cert. denied*, 506 U.S. 832 (1992).

## III. ANALYSIS

Plaintiff has failed to marshal any competent summary judgment evidence demonstrating that he was unlawfully discriminated against because of his disability. As an initial matter, none of the conduct complained of by Plaintiff is actionable under any of his claims. Furthermore, undisputed evidence in the record establishes that the individual defendants had an objectively reasonable basis for suspecting Plaintiff of academic dishonesty. Plaintiff lacks any evidence to demonstrate that Defendants were motivated in any way by his disability rather than by a legitimate suspicion that he had attempted to cheat on an exam. Defendants are entitled to judgment in their favor on all of Plaintiff's claims.

### A. Title II of the Americans with Disabilities Act

Plaintiff asserts that the University[20] violated Title II of the ADA, 42 U.S.C. § 12131 *et seq.* Title II states, in pertinent part, the following:

> Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.[21]

In order to establish a *prima facie* case under Title II of the ADA, Plaintiff must show: (1) that he is a qualified individual with a disability; (2) that he was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities or was otherwise

---

[20] As noted above, counts 1 and 2 of Plaintiff's complaint, the Title II and Rehabilitation Act claims, are asserted only against the University.

[21] 42 U.S.C. § 12132.

discriminated against; and (3) that such denial of benefits or discrimination was by reason of his disability.[22]

The University, relying on *Reickenbacker v. Foster*, 274 F.3d 974 (5th Cir. 2001), contends that Plaintiff's Title II claim against it is barred by the Eleventh Amendment. In response, Plaintiff identifies a wrinkle in this case not present in *Reickenbacker*: this suit was originally filed in state court, and was removed to this Court by Defendants' own affirmative assertion of federal jurisdiction.[23] Plaintiff points to the Supreme Court's recent decision in *Lapides v. Board of Regents of the University System of Georgia*, 535 U.S. 613 (2002), for the "general principle that voluntary appearance in federal court waives Eleventh Amendment immunity," including immunity related to federal claims like Title II.[24] The Fifth Circuit's recent decision in *Meyers ex rel. Benzing v. State of Texas*, __ F.3d __, 2005 WL 1178010 (5th Cir. May 19, 2005), supports Plaintiff's position. In *Meyers* the Fifth Circuit concluded that "*Lapides*'s interpretation of the voluntary invocation principle, as including the waiver-by-removal rule, applies generally to any private suit which a state removes to federal court."[25] Accordingly, under *Meyers*, Plaintiff is correct that the University waived its immunity from suit in this Court with respect to any and all claims asserted against it, regardless of whether those claims arise under federal or state law. The immunity inquiry, however, does not end there. The *Meyers* court concluded that "a sovereign enjoys two kinds of immunity that it may choose to waive or retain separately–immunity from suit and immunity from liability."[26] Thus a state is able, "if its law authorizes, to waive its immunity from suit without waiving its

---

[22]*See Lightbourn v. County of El Paso, Texas,* 118 F.3d 421, 428 (5th Cir.1997) (discussing 42 U.S.C. § 12132).

[23]*See Notice of Removal* (Doc. 1).

[24]*Plaintiff's Response to Defendants' Motion for Summary Judgment* (Doc. 14) at 4.

[25]*Id.* at *4.

[26]*Id.* at *14.

immunity from liability."[27]  As in *Meyers*, whether "Texas [*i.e.*, the University] has retained a separate immunity from liability is an issue that must be decided according to that state's law."[28]

This Court, however, need not address whether the University is entitled to immunity from liability under Texas state law because Plaintiff clearly fails to state a claim under the ADA. Plaintiff's own allegations establish nothing more than that his professor, acting on an objectively reasonable suspicion of academic dishonesty, attempted to ensure that Plaintiff suffered the ordinary consequences of cheating on an exam. Plaintiff has not alleged that the University failed to provide him any accommodations related to his disability–indeed, the record establishes that the University ensured that Plaintiff received special treatment in light of his disability, including extra time to take his examinations. Moreover, as the University points out, Plaintiff himself acknowledges that Trombetta had an objectively reasonable basis for suspecting him of academic dishonesty. In particular, Plaintiff stated the following during his deposition:

> Q. Did you just feel like it was–it was bad luck that Mr. M.B. happened to go into the men's room while you were in there with the exam?
>
> A. Say it was very bad.
>
> Q. Why did you think it was bad luck?
>
> A. Well, you can judge by the outcome, I guess.
>
> Q. Made you look bad?
>
> A. It led us down the road that we're at now.
>
> Q. So that's–so, the fact that Mr. M.B. happened to walk in right then is what made it look like you're cheating; is that right?
>
> A. I'd say so.
>
> * * *

---

[27]*Id.  See, e.g.*, *Nagm v. Univ. of Texas Health Science Center at Houston*, __ F.Supp.2d __, 2005 WL 1185801 (S.D. Tex. May 11, 2005) (holding that "the state agencies in this action waived their sovereign immunity to be sued in a federal forum...when they removed this action and affirmatively invoked this Court's jurisdiction," but that, nevertheless, this waiver did not "somehow change the requirement under Texas state law that there must be '*legislative* consent to sue the State on a breach of contract claim,'" and therefore dismissing the breach of contract claim).

[28]*Id.* at *16.

> Q. Do you agree that it looks suspicious for a student from the class to go into the men's room at the same time you took the exam in with you?...
>
> A. I can see that–how there would be suspicion.[29]

The Court agrees with Plaintiff: it, too, can see how there would be suspicion, and the Court finds that the record establishes that Trombetta had an objectively reasonable basis for suspecting Plaintiff of academic dishonesty.

Furthermore, and critical to the disposition of most of Plaintiff's claims, the Court also finds that Plaintiff has failed to marshal any evidence that Trombetta or any other University employee discriminated against Plaintiff *because of* his disability. Plaintiff's complaint and his response to Defendants' motion for summary judgment are filled with allegations of discriminatory intent. Allegations, however, are not sufficient to survive summary judgment. The sole piece of evidence identified by Plaintiff to suggest that any of the Defendants were motivated by discriminatory animus in any way (and were not motivated solely by their suspicion that Plaintiff had attempted to cheat on an exam) is the testimony of Plaintiff's mother. According to Plaintiff's counsel, Ms. Sadik testified that Ms. Amoruso, the director of the University's Center for Disabled Students, telephoned her and "told her an engineering professor had called to inquire about plaintiff and another student with a disability, expressing that disabled individuals should not be in engineering. Ms. Sadik said Ms. Amoruso stated that professor did not agree with the accommodations given disabled students for testing, and that the professor was not an engineer."[30]

The Court finds that this evidence is unreliable and inadmissible, and, upon closer inspection, finds that Ms. Sadik's testimony does not even support the contention that Trombetta (or any other Defendant) was motivated by discriminatory animus. Plaintiff's counsel points to two documents as substantiating his description of Ms. Sadik's testimony: (1) a formally worded, typed declaration signed by Ms. Sadik on 10 September 2002; and (2) portions of a transcript from Ms. Sadik's

---

[29] Sadik Deposition (Doc. 13) Ex. T at 125 & Ex. U at 284.

[30] *Plaintiff's Memorandum in Opposition to Defendants' Motion for Summary Judgment* (Doc. 14) at 8.

deposition, taken on 01 September 2004. The typed declaration states, in pertinent part, that Amuroso telephoned Ms. Sadik and "stated that the faculty member said that because engineers have to move easily on projects on which they are working, that it is not appropriate for any individual with a physical disability to want to be an engineer."[31] Ms. Sadik's recent deposition, however, which was clearly in her own words, reveals that either the typed declaration misrepresented what was actually said during the alleged telephone conversation or that her memory of the conversation has since changed. To begin with, Ms. Sadik testified at her deposition that she does not remember *who* called her or *when* the call took place.[32] The caller was "from the disabilities center," and had spoken to an engineering professor, and this professor wanted to know what Plaintiff's and another student's disabilities were "to determine why they needed extra time on the test."[33] The caller said that she was trying to reach Plaintiff to let him know that if the professor questioned him "he did not have to disclose anything, that he was under the disability pool and he did not have to."[34] Furthermore, the caller noted that the professor "said that an engineer had to be able to make quick decisions and be speedy in his work."[35] Ms. Sadik laughed and said she knew engineers and they are slow, very slow, and she didn't "know any of them that are fast at their work, or thinking, or moving."[36] Nothing else was said at the deposition with respect to statements by the professor relating to the essential abilities of engineers.

There is no dispute that Ms. Sadik cannot remember when this alleged telephone conversation took place and that she does not know who she spoke to. For those reasons alone her testimony is unreliable and inadmissible. Furthermore, while testimony directly by Amoruso that a University employee made statements evincing discriminatory animus might not be hearsay, since

---

[31] Doc. 14 Ex. 4.

[32] Doc. 14 Ex. 5 at 20.

[33] *Id.* at 21.

[34] *Id.*

[35] *Id.* at 22.

[36] *Id.*

it would not be offered for the truth of the matter asserted but to show the animus, the Court finds that testimony by Ms. Sadik that Amoruso said that a professor said such things is inadmissible hearsay, since Amoruso's statement *is* being offered for the truth of the matter asserted, *i.e.* that a University professor in fact made such statements.[37] Ms. Sadik's testimony is incompetent summary judgment evidence for that second, independent reason.

Ms. Sadik's testimony is thus inadmissible in this case. Furthermore, Plaintiff has no other evidence of discriminatory animus: he points only to the conduct of the individual professors described above, most of which is not actionable at all and all of which can be explained by what Plaintiff has essentially acknowledged was an objectively reasonable suspicion that he had attempted to cheat on his exam. Plaintiff therefore cannot show that he was discriminated against "by reason of [his] disability,"[38] as required to state a claim under the ADA. Accordingly, the University is entitled to judgment on Plaintiff's ADA claim.

**B.     Rehabilitation Act**

The University is entitled to summary judgment on Plaintiff's Rehabilitation Act claim for the same reason. In order to establish a *prima facie* case under the Rehabilitation Act, Plaintiff must show that (1) he is a qualified individual with a disability; (2) that he was excluded from participation in, denied benefits of, or subjected to discrimination under the University's program *solely because of his disability*; and (3) that the University receives federal financial assistance.[39] As discussed above, Plaintiff has failed to marshal any evidence demonstrating that he was subjected to discrimination of any kind solely because of his disability. Accordingly, the University is entitled to judgment on this claim.

**C.     Remaining Claims**

---

[37] Federal Rule of Evidence 801; *see also Pakizegi v. First National Bank of Boston*, 831 F. Supp. 901, 909 (D. Mass. 1993) (excluding similar testimony as inadmissible double hearsay and thus incompetent summary judgment evidence).

[38] 42 U.S.C. § 12132; *Lightbourn v. County of El Paso, Texas,* 118 F.3d 421, 428 (5th Cir.1997).

[39] 29 U.S.C. § 794(a); *Melton v. Dallas Area Rapid Transit*, 326 F.Supp.2d 767, 772 (N.D. Tex. 2003).

13

Plaintiff's remaining claims fail for the same reason–because he has no evidence of discriminatory animus–or because they fail to state a claim and / or are outright frivolous.

### 1. *Section 1983 Claim Against Individual Defendants*

Plaintiff's § 1983 claim against the individual professors, based on the allegation that they conspired to violate his constitutional rights, fails because of the lack of evidence of discriminatory intent. Plaintiff failed to identify any evidence of intent on the part of any of the professors to deprive him of any rights or privileges because of his disability. With respect to Professors Glover and Long in particular, whose participation in the alleged conspiracy against Plaintiff consisted of acts such as requiring students to write on their exams that they had neither given nor received aid while taking the exam, the Court considers Plaintiff's claims to be outright frivolous.

In addition, the Court agrees with the individual defendants that they are entitled to qualified immunity. In cases asserting claims arising under federal law, "government officials acting within their discretionary authority are immune from civil damages if their conduct does not violate clearly established statutory or constitutional law of which a reasonable person would have known."[40] Furthermore, "[e]ven if the government official's conduct violates a clearly established right, the official is nonetheless entitled to qualified immunity if his conduct was objectively reasonable."[41] Plaintiff failed to even allege that Professors Glover and Long engaged in any activity that violated any of his constitutional rights. With respect to Professors Trombetta and Claydon, the Court finds that, in light of the undisputed facts surrounding Plaintiff's alleged academic dishonesty and the utter lack of evidence of discriminatory animus, Plaintiff failed to establish that these professors violated any of his constitutional rights, either. Defendants, in short, are entitled to judgment on Plaintiff's § 1983 claim.

### 2. *Due Process and Due Course of Law Claims*

---

[40]*Hernandez ex rel. Hernandez v. Texas Dept. of Protective and Regulatory Services*, 380 F.3d 872, 879 (5th Cir. 2004).

[41]*Id.*

14

The individual professors are similarly entitled to judgment on Plaintiff's fourth count, alleging that they conspired to deprive him of "liberty and property without due process or due course of law, secured to him by the Constitutions of the United States and of the State of Texas."[42] The record establishes that Plaintiff was given more than adequate procedural rights in connection with the charges of academic dishonesty, and that none of the individual defendants interfered with those rights. There is no dispute that Plaintiff was given an informal hearing at which he was allowed to respond to the charges against him; that Plaintiff was allowed to appeal the findings and recommendations that resulted from this initial hearing to a University hearing panel made up of three students and two faculty members; that at this appellate hearing Plaintiff had the right to call witnesses, to confront the witnesses against him, to have his attorney present, and to present his side of the story; and that, finally, Plaintiff had the right under the University's rules to appeal even the findings of this appellate hearing, which he exercised. Indeed, the provost ultimately reversed the finding of guilty. There is no question that Plaintiff had more than his share of procedural rights.[43] Finally, with respect to the grade of D+ Plaintiff received from Trombetta, Plaintiff has marshaled absolutely no evidence to prove that he was in fact entitled to a higher grade. The individual defendants are entitled to judgment on Plaintiff's due process and due course of law claims.

### 3. *Texas Human Resources Code and Texas Bill of Rights Claims*

---

[42]*Plaintiff's Original Petition* § 8.

[43]*See Davis v. Mann*, 882 F.2d 967, 973-74 (5th Cir. 1989) (noting that "[c]ourts overwhelmingly agree that students, whether dismissed for academic or disciplinary reasons, are not entitled to as much procedural protection under the Fourteenth Amendment as employees who are terminated from their jobs" and that a student dismissed for disciplinary reasons is entitled only to "oral and written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story"); *University of Texas Medical School at Houston v. Than*, 901 S.W.2d 926, 929 (Tex. 1995) (noting that "due course of law" and "due process of law" are "without meaningful distinction," so that Texas courts follow "contemporary federal due process interpretations of procedural due process issues," and holding that, "[a]t a minimum, when university officials seek to sanction a student for misconduct, our due course of law guarantee requires oral or written notice of the charges against the student and, if the student denies them, an explanation of the evidence the authorities have and an opportunity to present his or her side of the story."). Plaintiff's due course of law claim also fails for a second reason: the finding of academic dishonesty was ultimately reversed, and furthermore Plaintiff has chosen to transfer out of the University and is now attending another school. Plaintiff is not seeking reinstatement or any other meaningful injunctive relief. Essentially, therefore, Plaintiff's due course of law claim against the University is a claim for damages. There is, however, no cognizable action for damages under the Texas Constitution. *Securtec, Inc. v. County of Gregg,* 106 S.W.3d 803, 816 (Tex.App.-Texarkana 2003, no pet.); *see also City of Beaumont v. Bouillion,* 896 S.W.2d 143, 148-49 (Tex.1995).

Defendants are likewise entitled to judgment on Plaintiff's three remaining claims. Count five alleges that Defendants violated Texas Human Resources Code § 121.003. As its terms indicate,[44] that provision applies primarily to physical access to public facilities for disabled individuals. Plaintiff was never denied physical access to any public facilities and was, at all relevant times, provided special treatment by the University in light of his physical disability (*e.g.,* extra time on examinations). To the extent Plaintiff's allegations state a claim under § 121.003, the Court finds that Defendants are entitled to summary judgment because Plaintiff has failed to marshal any competent evidence to demonstrate the Defendants' actions were motivated by anything other

---

[44] The statute states the following:

(a) Persons with disabilities have the same right as the able-bodied to the full use and enjoyment of any public facility in the state.

(b) No common carrier, airplane, railroad train, motor bus, streetcar, boat, or other public conveyance or mode of transportation operating within the state may refuse to accept as a passenger a person with a disability solely because of the person's disability, nor may a person with a disability be required to pay an additional fare because of his or her use of an assistance animal, wheelchair, crutches, or other device used to assist a person with a disability in travel.

(c) No person with a disability may be denied admittance to any public facility in the state because of the person's disability. No person with a disability may be denied the use of a white cane, assistance animal, wheelchair, crutches, or other device of assistance.

(d) The discrimination prohibited by this section includes a refusal to allow a person with a disability to use or be admitted to any public facility, a ruse or subterfuge calculated to prevent or discourage a person with a disability from using or being admitted to a public facility, and a failure to:
(1) comply with Article 9102, Revised Statutes;
(2) make reasonable accommodations in policies, practices, and procedures; or
(3) provide auxiliary aids and services necessary to allow the full use and enjoyment of the public facility.

(e) Regulations relating to the use of public facilities by any designated class of persons from the general public may not prohibit the use of particular public facilities by persons with disabilities who, except for their disabilities or use of assistance animals or other devices for assistance in travel, would fall within the designated class.

(f) It is the policy of the state that persons with disabilities be employed by the state, by political subdivisions of the state, in the public schools, and in all other employment supported in whole or in part by public funds on the same terms and conditions as persons without disabilities, unless it is shown that there is no reasonable accommodation that would enable a person with a disability to perform the essential elements of a job.

(g) Persons with disabilities shall be entitled to full and equal access, as other members of the general public, to all housing accommodations offered for rent, lease, or compensation in this state, subject to the conditions and limitations established by law and applicable alike to all persons.

(h) A person with a total or partial disability who has or obtains an assistance animal is entitled to full and equal access to all housing accommodations provided for in this section, and may not be required to pay extra compensation for the animal but is liable for damages done to the premises by the animal.

(i) An assistance animal in training shall not be denied admittance to any public facility when accompanied by an approved trainer who is an agent of an organization generally recognized by agencies involved in the rehabilitation of persons who are disabled as reputable and competent to provide training for assistance animals, and/or their handlers.

(•) A person may not assault, harass, interfere with, kill, or injure in any way, or attempt to assault, harass, interfere with, kill, or injure in any way, an assistance animal.

V.T.C.A., Human Resources Code § 121.003.

than an objectively reasonable suspicion that he had cheated on his exam. In addition, the Court agrees with Defendants that § 121.003 does not provide a cause of action for damages against the state or its agencies, and that the individual Defendants are entitled to official immunity with respect to this claim. Plaintiff's sole response to this argument is that Defendants waived any such immunity to damages when they removed this action.[45] While the Court has not and need not rule on whether the University waived Eleventh Amendment immunity to suit in federal court by removing this action, there is no sound legal basis to support the argument that Defendants' removal of this action changes the substantive scope of § 121.003 or abrogates the professors' official immunity defenses. In sum, all Defendants are entitled to judgment on the § 121.003 claim.

All Defendants are similarly entitled to judgment on Plaintiff's claim that they violated Texas Human Resources Code § 121.010. That provision applies only to tests that "evaluate[] an adult with a disability for a job position in business, government, or industry, or a test to determine that person's educational level."[46] Plaintiff has not alleged that he was being evaluated for a job position in business, government or industry, or that Defendants were attempting to determine his educational level. Accordingly, the Court finds that Plaintiff has failed to state a claim under § 121.010. Furthermore, even assuming § 121.010 applied in this case, there is no dispute that the University afforded special treatment to Plaintiff in light of his disability, in particular by allowing him extra time to take exams. As to the individual professors' alleged conduct, § 121.010 does not proscribe any of the actions Plaintiff complains of, at least not in the face of objectively reasonable suspicions of academic dishonesty, such as those in this case. Defendants are entitled to judgment on this claim.

Finally, Plaintiff claims that the individual Defendants violated his equal rights under the Texas Constitution. Plaintiff acknowledges that there is no cause of action in Texas for damages under the Texas Constitution, but contends that he is entitled to declaratory relief. The equal rights

---

[45] *Plaintiff's Memorandum in Opposition to Motion for Summary Judgment* (Doc. 14) at 12.

[46] V.T.C.A., Human Resources Code § 121.010.

provision of the Texas Constitution is analyzed in the same manner as the equal protection clause of the U. S. Constitution.[47] Presumably, Plaintiff claims that he was treated differently than others who are similarly situated because of his disability. As noted above, however, Plaintiff has failed to marshal any evidence of discriminatory animus, and thus has no evidence to show that his treatment by Defendants was not simply the result of reasonable suspicion that he had cheated on his exam. Furthermore, an even more fundamental problem with this claim is that Plaintiff has failed to identify any similarly-situated, non-disabled persons who were treated differently. Indeed, M.B., the student who was believed to have collaborated with Plaintiff to cheat on the exam, is and was a non-disabled student, and he received precisely the same treatment as Plaintiff. In sum, Plaintiff's equal rights claim is wholly without merit and Defendants are entitled to judgment on this last claim.

## IV.   CONCLUSION

Plaintiff has failed to marshal any competent summary judgment evidence demonstrating that he was unlawfully discriminated against because of his disability. Furthermore, undisputed evidence in the record establishes that the individual defendants had reasonable grounds to suspect Plaintiff of academic dishonesty. In sum, Plaintiff lacks any evidence to demonstrate that Defendants were motivated in any way by his disability rather than by a legitimate suspicion that he had attempted to cheat on an exam. Accordingly, Defendants are entitled to judgment in their favor on all of Plaintiff's claims.

**SIGNED** at Houston, Texas, August 1st, 2005.

_____
MELINDA HARMON
UNITED STATES DISTRICT JUDGE

---

[47]*Rose v. Doctor's Hospital*, 801 S.W.2d 841, 846 (Tex. 1990).